**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LOUIS K. ZAKNOUN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. |
| | ) | |
| THE BOARD OF TRUSTEES OF THE VILLAGE | ) | |
| OF NORTHFIELD, ILLINOIS; PATRICK | ) | JURY TRIAL DEMANDED |
| BRENNAN, in his Capacity as Village Manager; | ) | |
| WILLIAM LUSTIG, in his capacity as Chief | ) | |
| of Police; MICHAEL HUTENSKY, in his | ) | |
| capacity as Acting Chief of Police, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, Louis K. Zaknoun, by counsel, Edward G. Zaknoen, brings this Complaint against the Village of Northfield, Illinois, and its officers and agents, Patrick Brennan, William Lustig, and Michael Hutensky, for damages and equitable relief for violations of Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. §§ 2000e et seq.), the Americans with Disabilities Act, (42 U.S.C. §§ 12101 et seq.), the Age Discrimination in Employment Act, (29 U.S.C. §§ 621 et seq.), and the Illinois Human Rights Act, (740 ILCS § 23/1 et seq.), for their discrimination, harassment, retaliation and constructive discharge due to hostile work environment, based on Plaintiff's national origin, past complaints of discrimination and harassment, age, and temporary disability.

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Louis K. Zaknoun, (hereinafter, "Plaintiff," or "Zaknoun"), at all times relevant herein was a citizen and resident of the State of Illinois, residing in the City

1

of Joliet, Will County, Illinois, and, until recently was employed by the Village of
Northfield, Cook County, Illinois, as a sworn police officer.

2. Zaknoun was born in Beirut, Lebanon, and is of Lebanese descent. He immigrated
legally to the United States of America, with his family, when he was 10 years old, in
1981.

3. Zaknoun is 54 years of age.

4. Plaintiff graduated from the Illinois Police Academy in 1996 and served as a sworn
police officer for the City of Joliet from 1996 to 2010. He began employment as a
police officer with the Village of Northfield in 2012. Plaintiff has been a sworn police
officer in the State of Illinois for 27 years and served the Village of Northfield as a
sworn police officer for the last 12 years, prior to his resignation.

5. Plaintiff's most recent evaluation rated him as exceeding expectations in every
category and noted his willingness to help others without being asked, helping laterals
acclimate, his job knowledge, punctuality, willingness to work overtime and change
shifts, completing reports and investigations in a thorough and timely manner, his
high productivity, his ability to deescalate calls, and other matters. Over the years,
Plaintiff received various letters of praise and certificates of merit and
acknowledgement. Plaintiff has past and present certifications and training in
Hostage Negotiation, Basic and Advanced Interviews and Interrogation Techniques,
SLATT Instructor, Security and Mental Health Awareness, and others.

6. Defendant, the Board of Trustees of the Village of Northfield, Illinois, (hereinafter
"the Board,"), is a body politic and corporate organized and established under the
laws of the State of Illinois to manage and govern the Village of Northfield,

(hereinafter, "the Village," or "Northfield,"), including the Northfield Police Department, (hereinafter "the Department.").

7. The Board is an employer in an industry affecting commerce under Title VII. Upon information and belief, the Board employs between 50 and 100 employees.

8. Defendant Patrick Brennan, (hereinafter "Brennan,"), is an individual residing in Cook County, Illinois, and currently serves as the Village Manager for the Village of Northfield. The Village Manager is appointed by the Village President and the Board. The Village Manager serves as the Chief Administrative Officer for the Village and, upon information and belief, is granted the power to hire and fire civilian employees. Brennan was appointed Village Manager in April of 2024. The Village Manager does not have the power to hire, fire, or discipline sworn police officers but may bring charges against sworn police officers before the Village of Northfield's Board of Police Commissioners, (hereinafter "BOPC,"). At times relevant hereto, Brennan acted within the course and scope of his employment by the Village as the Village Manager, and under color of law, and had supervisory authority over Zaknoun when he took the illegal actions herein.

9. Defendant William Lustig (hereinafter "Lustig,"), is an individual residing in Cook County, Illinois, and served as the Chief of Police for the Village of Northfield for the past 24 years. Upon information and belief, Lustig was recently on some type of leave from the Department prior to his retirement. At times relevant hereto, Lustig acted within the course and scope of his employment by the Village as the Chief of Police, and under color of law, and had supervisory authority over Zaknoun when he took the illegal actions herein.

3

10. Defendant Michael C. Hutensky, (hereinafter "Hutensky,"), is an individual residing in Cook County, Illinois, and at times relevant hereto held the rank of Deputy Chief of Police for the Village of Northfield and, at times relevant hereto, served as the Acting Chief of Police. Hutensky was promoted to Deputy Chief by Lustig within the last several years. On or about May 21, 2024, Hutensky was named Acting Chief of Police due to Chief Lustig being placed on leave. On or about December 23, 2024, Hutensky was promoted to Chief of Police, to replace Lustig. At times relevant hereto, Hutensky acted within the course and scope of his employment by the Village as the Deputy and Acting Chief of Police, and under color of law, and had supervisory authority over Zaknoun when he took the illegal actions herein.

11. On or about October 10. 2024, Plaintiff filed a timely charge of discrimination with the local EEOC office against the Village, Brennan, Lustig, and Hutensky, and was granted a Notice of Right to Sue on or about October 11, 2024. This Complaint is being brought within 90 days of Plaintiff receiving his Notice of Right to Sue. Plaintiff's EEOC Charge is attached hereto as Exhibit A. Plaintiff's Notice of Right to Sue is attached hereto as Exhibit B.

12. This court has original subject matter jurisdiction over Plaintiff's Title VII, ADA, and ADEA claims pursuant to 28 U.S.C. §§ 1331 and 1337.

13. This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that Plaintiff is a resident of this District and Defendants' unlawful acts and omissions complained of herein took place within the geographical boundaries of this District.

## DENIAL OF PROMOTION LIST

15. On or about October 21, 2023, Plaintiff took the written test as part of the promotional process to seek to be put on the Promotion List. In addition to the written test score, other categories are included to arrive at a total score for purposes of being put on. and the ranking on, the Promotion List. One of the categories includes "Chief's Points," which are put under the category of "Merit and Efficiency," with subcategories that mirror the categories of performance evaluations for the officers.

16. Despite the fact that Zaknoun had been an officer for around 25 years and had received performance evaluations indicating that he nearly always met or exceeded expectations and contributed to the Department, Chief Lustig gave him a score of 3.1 out of 20 for the Merit and Efficiency category, while the average score was 10.81. Plaintiff only needed a score of 9.6 to be put on the Promotion List, but Lustig gave him the lowest score of anyone, a score so far below average that it was meant to communicate to him that there was no point in him ever trying to get promoted. Lustig intended to and did cause Zaknoun mental distress and emotional anguish regarding this incident as any employee in those circumstances would feel. The score of 3.1 was outrageous and preposterous on its face given Zaknoun's training, evaluations, and experience.

17. Plaintiff believes that Lustig gave him the score in retaliation for his past complaints of harassment and Plaintiff's handling of a police call involving the Village President, which had occurred in January of 2023. Indeed, Lustig had sent an email to Hutensky and others stating that if Zaknoun continued to complain about his discipline, he might never get promoted.

18. On or about January 25, 2023, Plaintiff received a call on his cell phone while on duty from Sergeant Jason Janusz, who told him that Chief Lustig had called him and wanted someone to go check a disturbance call on Thornwood Lane in the Village of Northfield.  Both Lustig and Janusz used their cellphones instead of calling dispatch as required.

19. Plaintiff arrived at the scene to find a disturbance between the Village President and a Hispanic Amazon truck driver delivering packages.  Sgt. Janusz arrived on the scene after Plaintiff. Plaintiff took the report, which included the statement of an uninterested witness.

20. Afterwards, Sgt. Janusz told him that Chief Lustig wanted the incident to "go away," because it reflected negatively on the Village President. Plaintiff told Janusz that he would not do anything like that and Janusz agreed with him.

21. Later, other supervisory personnel, a Detective and Sergeant, told Plaintiff that Chief Lustig wanted to call the Amazon driver and offer money to "settle" the matter. Plaintiff and the others all agreed that was improper and the Village President could try to settle if he wanted but the police should not be involved in that.

22. Plaintiff believes his low rating on the Chief's Points was in retaliation for writing an accurate report which did not reflect positively on the Village President and not simply making the whole incident "go away," when he arrived at the scene, in addition to Plaintiff's past complaints of harassment as detailed below.

23. Because of Lustig's retaliation in giving Plaintiff a score of 3.1, he was kept off the Promotion List, and would not be in the ranking to be promoted to Corporal as vacancies opened, as he should have been.

## DENIAL OF LIGHT DUTY AND/OR UNPAID LEAVE

24. On or about April 1, 2024, Plaintiff took leave under the Family and Medical Leave Act to have back surgery, which he had on April 11, 2024.

25. After the surgery, Plaintiff developed an infection which slowed his healing process, and, as a result of the infection and other matters, including the mental distress caused by Defendants' actions herein, he was not able to return to full duty as he originally anticipated when his Family and Medical Leave time expired.

26. As a result of the post-surgical complications, Plaintiff had restrictions on his activities, including, lifting, reaching, bending, stooping, straining, etc. As such, he was temporarily suffering from a physical condition that substantially limited one or more of his major life activities within the meaning of the Americans with Disabilities Act.

27. On or about April 25, 2024, he provided a note from one of his health care providers to the Village, indicating that he needed to remain off work and would be reevaluated on May 31, 2024.

28. On or about April 26. 2024, Plaintiff emailed Acting Chief Hutensky and Director of Administration Melissa Jewett, informing them of his medical situation and requesting from Acting Chief Hutensky that he be granted light duty as had been done for other officers in the past.

29. Acting Chief Hutensky deferred on Zaknoun's request, claiming that he needed to consult with the new Village Manager, Brennan, who began serving as Village Manager at some time in April of 2024.

30. On or about May 22, 2024, Zaknoun emailed Jewett another note from one of his health care providers, which explained that Zaknoun had had back surgery, and had developed an infection. He had been readmitted to the hospital. The note stated that the health care provider believed Zaknoun would be released for light duty on June 20, 2024, and would be reevaluated six (6) weeks after that date for return to work.

31. Upon information and belief, in the past, the Chief has been able to grant light duty requests on his own without needing the permission of the Village Manager. Indeed, upon information and belief, in the past, the Chief has actually proactively offered injured officers light duty without the need for them to first use their FMLA or accrued paid leave.

32. As a result of his temporary disability which prevented him from returning to full duty at the end of his leave, Defendants Brennan and Hutensky embarked on a course to refuse any requests for accommodation so that they could terminate Zaknoun in retaliation for his past complaints of discrimination and harassment.

33. On or about May 29, 2024, Zaknoun (and his wife) met with Brennan, and with Melissa Jewett, the Director of Administrative Service for the Village of Northfield, in an effort to convince Brennan to provide him light duty or at least additional unpaid leave as permitted under the Village Handbook, because there had been no response to his original or subsequent requests. At the time of this meeting, Zaknoun still had a PIC line in his arm and Brennan knew he would not be able to return to full duty. On that same date, Zaknoun emailed Jewett and Brennan thanking them for taking the time to meet with him and again requesting light duty beginning on June

20, 2024, because his FMLA and other time would expire on or about June 21, 2024, or in the alternative, for unpaid leave.

34. After the meeting, Brennan did not provide a definite response to Zaknoun. Instead, Zaknoun sent follow up emails with information from his health care provider as his recovery course progressed, including a note on June 10, 2024, indicating that he would be released for light duty on June 20, 2024, and return to full duty on August 1, 2024. Again, there was no response from Brennan.

35. Even though the Department does not maintain permanent light duty positions, it has a policy and practice in the past, of creating light duty positions to accommodate injured officers. For example, General Order 04-123, specifically addresses modified duty assignments, and provides that preference should be given for those with work-related injuries but states that those with a disability covered by the Americans with Disabilities Act "shall be treated equally, without regard to any preference for a work-related injury."

36. Past practice of the Department and the Village at large, is to grant light duty when needed. For example, at least 4 police officers have been granted light duty in the recent past, and, upon information and belief, at least one officer was given light duty for a non-work-related injury without first being required to take paid time off or exhaust accrued time or FMLA leave. Further, upon information and belief, a fireman employed by the Village was given light duty in the past for nearly eleven (11) months.

37. Zaknoun is unaware of any police officer who was refused light duty when requested.

38. At the meeting with Brennan on May 29, Zaknoun detailed specific tasks he could perform for the Department as part of his light duty assignment, such as taking walk-in reports, delayed crash reports, follow-up reports, entering evidence into the computer system, walk-in fingerprinting requests, assistance with record-keeping, assisting the Detective with investigations because the Detective is being required to do patrol, and other tasks.

39. At this time, and for several years prior, the Department has been under the number of authorized officers and patrolmen have been forced to work overtime, double shifts, and come in on their days off. In addition, the Department has been required to have its Detectives, Commanders, and School Resource Officer, engage in patrol so that the Village could have the requisite number of patrol officers on the street. Zaknoun's request for light duty, as aforesaid, would have helped relieve the administrative burden on these personnel until he was ready to return to patrol.

40. Despite all the factors that weighed in favor of granting Zaknoun's requests for either light duty or additional unpaid leave – the understaffing in the Department, the need to lighten administrative burdens on officers doing patrol, the express policies regarding light duty, and the past practice with respect to other officers and employees – Brennan and Hutensky determined to refuse any request made by Zaknoun so they could terminate him.

41. Upon information and belief, no other injured officer has been denied light duty by the Department or additional unpaid leave. Zaknoun was singled out to be treated in a manner not only contrary to logic but in a manner that no other officer has been treated.

42. On or about June 13, 2024, Brennan finally responded to Zaknoun's request for either light duty or unpaid leave. He sent correspondence to Zaknoun, by email, denying both requests based on the ostensible and pretextual reason that granting either request would undermine the best interests of the Village and that the Command Staff at the Police Department had advised that there were no light duty positions available. Brennan also stated that Zaknoun would be required to return to full duty on June 21, 2024, when his leave expired. Further, Brennan stated that these decisions were made with the advice of Acting Chief Hutensky.

43. After receiving the June 13, 2024, letter from Brennan, Zaknoun sought clarification from him as to what would happen if he was not able to return to full duty on June 21, 2024, as was being required of him. Brennan responded to Zaknoun by email after 9:00 pm, on June 18, 2024, after attending meetings of the Village Board and the Committee of the Whole.

44. At the June 18 meetings of the Village Board and the Committee of the Whole, there was an extensive discussion of the staffing problems at the Department and the fact that patrol officers were being forced to work overtime, come in on days off, and related matters. Indeed, there even was discussion about lessening the administrative burden on patrolmen and hiring additional civilian or sworn personnel to perform record-keeping functions and Detective functions. In fact, some of the same items discussed at the Village Board meeting were exactly the items Zaknoun had detailed for Brennan that he could do while he was recovering from his post-surgery complications.

45. At the Board Meetings, neither Brennan nor Hutensky, disclosed to the Village Board that they were, at that very moment, denying Zaknoun's request for light duty which would have helped lighten the administrative burden on the patrolmen, as discussed. Neither did Brennan or Hutensky disclose to the Village Board that also, at that very moment, they were planning on terminating Zaknoun, thereby creating another vacancy in the Department at a time when the Department had several vacancies open that it could not fill.

46. In fact, shortly after the Meeting, having concealed the facts regarding Zaknoun's situation from the Village Board, Brennan returned to his office and emailed Zaknoun at 9:41 p.m., informing him that if he did not return to work for three days after his leave ran out on June 21, 2024, he would be disciplined and that, pursuant to the Village Handbook, he would have been considered as resigning. As mentioned, this would create yet another vacant position at an already understaffed police department.

47. During this entire time period, according to the Village Handbook, Brennan could have simply given Zaknoun unpaid leave and, if he was not ready to return to work by the time other officers were ready to fill the vacant positions at the department, he could have then sought to terminate Zaknoun. However, he chose not even to grant unpaid leave at this time but to order Zaknoun back to full duty when he knew that Zaknoun was still recovering.

48. The next day, June 19, 2024, counsel for Zaknoun sent correspondence to Brennan and Hutensky threatening legal action if they did not reconsider their position.

49. Only after Zaknoun went to the trouble and expense of hiring attorneys to challenge Brennan and Hutensky on their scheme to terminate him in violation of law, did

Brennan relent and ask Zaknoun to have his physician fill out a work restriction form provided by the Village attorneys for the purpose of assigning him to a modified duty position. Zaknoun duly provided the form as filled out by his health care provider.

50. Yet Brennan and Hutensky's unfair treatment continued. Rather than assigning Zaknoun to light duty within the Department as had been done numerous times in the past for other police officers, they continued to deny him light duty at the Department. Obviously, having taken the position in their letter of June 13, 2024, that "command staff has indicated that a restricted duty position is not available," they could not now reverse course and give him a light duty position in the police department without implicitly admitting that the statement that such a position was not available was not accurate when made.

51. Instead, Brennan assigned Zaknoun to an ad-hoc position in the Village Hall, having nothing to do with the Department, scanning documents.

52. The position to which Brennan assigned Zaknoun had restricted hours, which made it virtually impossible for Zaknoun to work eight (8) hours a day and attend his necessary physical therapy. In the past, when other officers were injured and given light duty, they were allowed to work around their physical therapy schedules so that they could get their full hours in for the day. Again, Zaknoun was treated differently.

53. When Zaknoun requested that he be allowed to come in early so that he could work a full eight (8) hour day and attend his physical therapy, Brennan also denied this request despite the fact that other Village employees were allowed to come in early because of traffic considerations.

54. At some point during July of 2024, while Zaknoun was performing his light duty scanning documents at the Village Hall, Brennan called Zaknoun into his office and asked him to discuss various issues facing the Department. Zaknoun then disclosed to Brennan that he believed that he had been mistreated, discriminated against, and harassed for a number of years at the Department. Brennan pretended to show concern about these past incidents.

### AUGUST 29, 2024 CHARGES TO TERMINATE ZAKNOUN

55. On or about July 25, 2024, Zaknoun returned to his health care provider for his previously scheduled appointment. At that point, due to the infection and post-surgical complications he still was not able to be released for full duty. His health care provider recommended continued light duty with Zaknoun to be reevaluated in 12 weeks, in early October.

56. Zaknoun gave his health care provider's evaluation to Brennan as requested.

57. On or about August 7, 2024, Brennan had a letter hand delivered to Zaknoun to attend an "interactive meeting," to discuss his return to full duty as a patrol officer, even though Brennan knew that Zaknoun had not been released to return to patrol.

58. On or about August 16, 2024, Zaknoun attended the meeting with Brennan and Jewett. At the meeting, Zaknoun stated that he was doing all that he could to try to heal more quickly but that he was following the advice of his health care provider and did not believe that he could return to full duty at that time.

59. Brennan thereafter decided to claim that the project that Zaknoun had been working on would be finished and that there were no other light duty positions available at the Village or Department to accommodate Zaknoun, despite the critical understaffing at

14

the Department and Zaknoun's ability to perform a myriad of light duty tasks for the Department as other officers had done in the past.

60. On August 29, 2024, Jewett, at Brennan's direction, emailed Zaknoun and told him that his light duty position scanning documents was ending at the end of the next day, and that he would then be placed on unpaid administrative leave.  Without Zaknoun's request, he was paid all accrued time on his next paycheck. When he asked why he had received that pay because he had not requested it, he was informed that Director Jewett had told payroll to pay out all his time. Jewett later claimed it was the result of a "payroll glitch."

61. On August 29, 2024, Brennan filed a Complaint against Officer Zaknoun with the Board of Police Commissioners, ("BOPC"), seeking his termination and claiming falsely that Zaknoun had no reasonable prospect of returning to full duty at any time in the foreseeable future and misrepresenting Zaknoun's statements at the August 16 meeting.

62. According to the Rules and Regulations of the BOPC, Brennan knew that a hearing would have to be held within thirty (30) days of the Complaint/Charges being filed, which would mean that the latest date for the hearing to begin would be September 28, 2024, shortly prior to the time Zaknoun was scheduled to be reevaluated by his health care provider.

63. Despite the obvious ability of the Department to create a short-term light duty position for Zaknoun as it had done for other officers in the past, Brennan still had the power under the Village Handbook to simply grant Zaknoun unpaid leave until after

his next doctor's appointment in October. But, instead, he decided to proceed on the path of attempting to terminate him.

64. While Zaknoun had been performing his light duty position at the Village Hall scanning documents, Brennan made several comments to him about his age and how "at our age," it takes longer to heal and maybe it would be better for him to retire and move on to another profession.

65. Brennan only became the Village Manager in April, and prior to the May 29, 2024 meeting had never met Zaknoun.

66. Brennan thus relied at least in part on the advice of Acting Chief Hutensky and/or Chief Lustig and others in Command Staff, in determining whether there was a light duty position available, whether to grant Zaknoun unpaid leave, or whether to terminate him.

67. Zaknoun had complained to Brennan about his mistreatment at the hands of Command Staff over the years, including by Hutensky.

68. Brennan thus knew that Hutensky had animus towards Zaknoun but followed his advice anyway and worked in concert with him to deny Zaknoun either unpaid leave or light duty at the Police Department, and, instead, to seek to terminate him.

69. Hutensky was promoted to Deputy Chief in or around 2022, by then Chief Lustig. Chief Lustig himself had medical issues and was granted several months of leave after his FMLA and accrued time ran out. Plaintiff does not know whether this leave was paid or unpaid.

70. Zaknoun had complained about unfair treatment and harassment at the hands of Chief Lustig both to Lustig himself, in the past, before he was placed on leave and to Brennan when he met with Brennan in July 2024.

71. When the BOPC set a hearing, it originally purported to hold both a Probable Cause hearing, to be immediately followed by a hearing on the merits of the Charge itself. Only after Zaknoun's counsel complained that this was a violation of the BOPC Rules and Regulations requiring separate hearings on probable cause and on the merits, did the BOPC reverse itself and then agree to hold the hearings on different dates as was required.

72. In addition, the BOPC, originally attempted to schedule the hearing in an extremely short time frame that would not have provided Zaknoun with the required 5 days notice under the BOPC Rules and Regulations. Again, only after Zaknoun's counsel complained that the Rules and Regulations were not being followed, did the BOPC alter its course.

73. Further, the BOPC published online at the Village's website a public-facing agenda giving notice of the hearing that named Officer Zaknoun specifically, styled "Complaint by Village Manager Patrick Brennan to terminate Officer Louis K. Zaknoun."

74. Plaintiff is unaware of personnel matters involving medical or other issues, (unrelated to misconduct), specifically naming the officer or other employee involved in public documents. Rather, these proceedings are almost always described as "Confidential Personnel Matters." Again, Zaknoun was treated differently than other employees.

75. By publicizing Zaknoun's name on the agenda and the existence of a Complaint to terminate him by the Village Manager, the Village created a situation in which third parties coming across the information on the internet would most likely assume that Zaknoun had engaged in misconduct.

76. In addition, by publicizing the Complaint against Zaknoun, it put Zaknoun in a position of having to disclose his personal, private medical information if he wanted to contextualize the information that was contained on the Village's website.

77. Zaknoun demanded that the Village take corrective action to protect his reputational and privacy interests, but the Village refused.

## PAST COMPLAINTS OF HARASSMENT

78. Plaintiff believes that he was mistreated in the past, due to his national origin as being of Middle Eastern descent, and an immigrant. Plaintiff never formally complained about harassment based on his national origin or ethnicity previously but believes it was a motivating factor in his mistreatment and the mistreatment of other non-white officers based on what he has observed over the years.

79. Command Staff, which is all white, and superior officers, including Corporals and Sergeants, "select" certain officers to pick on and other officers to succeed and be promoted. Plaintiff was selected to be picked on as were other officers of Hispanic and Pakistani descent. White officers were selected to be promoted. For example:

- Plaintiff and other minority officers would be written up for being minutes late to roll call, when white officers were not.

- Plaintiff and other minority officers were written up for sick time abuse when one white Corporal stated that he always called off 2 days in a row to make it look more believable.

- Plaintiff and other minority officers would be written up for being "improperly relieved," when they were actually following the same procedures that others followed.

- Sergeants might write memos to themselves and place it in the files of officers without the officer knowing, regarding some incident in which they portray the officer as somehow not meeting expectations or violating policy.

- Commander Hanus even stated to another officer that Command Staff liked to put things in their files so that it's easier to terminate them and harder for the officers to leave and find other employment as police officers.

- White officers were oftentimes hand-picked for training to become instructors, which in turn aided their promotions, while non-white officers were seldom asked.

- White officers were given informal preference for overtime shifts, vacation and comp. time, and to avoid forced overtime if they didn't want it.

- Plaintiff believes that during his entire tenure at the police department, there has been only one minority Sergeant and one African American Corporal.

80. Plaintiff was harassed and mistreated in the past by Corporals Kevin Tierney and Jason Janusz. Plaintiff provided detailed information to Chief Lustig regarding the harassment. Despite his complaints, both Tierney and Janusz were promoted to Sergeant by Lustig.

81. In one instance Tierney accused Zaknoun of mishandling a prisoner's property, when, in fact, his Sergeant verified that the property was handled correctly. In his memo Tierney, implied that Zaknoun had lied about the prisoner's wishes regarding the property without talking to Zaknoun about it or to his Sergeant who was present. Zaknoun acknowledged that he had made a mistake in not completing one of the tasks requested before the end of his duty day because he had left early and intended to do it on his next day on duty because the prisoner's family would not be able to pick up

the property during the weekend. Rather than speak to Zaknoun about it, he was accused of engaging in concerning behavior and disobeying an order.

82. In that same incident, when Zaknouin had left one hour early, he forgot to turn in the appropriate form for comp. time but mistakenly left it in his squad car's visor. Tierney immediately went searching for the form, even though he was not Zaknoun's shift supervisor, in an attempt to get him in trouble. Zaknoun had explained to another Corporal on duty that he must have forgotten the form and would turn it in on his next day and sent him a picture of the completed form. Officers often turned in these forms the next day without any incident but in Zaknoun's case, Tierney attempted to accuse him of dishonesty.

83. In another instance, Tierney had forgotten to call on the radio that he was on duty. He was Zaknoun's relief that day. Zaknoun waited until Tierney had called on duty on the radio before leaving his shift, as he had been instructed to do previously. As a result, Zaknoun worked approximately 20 minutes of overtime. Tierney went looking for Zaknoun's OT slip and removed it from the OT box and placed it in the Chief's Box and then wrote a memo accusing Zaknoun of "shady" behavior. Video actually showed Tierney removing Zaknoun's OT slip. Again, Tierney was not Zaknoun's shift supervisor but went searching for the OT slip to attempt to get him in trouble.

84. In another instance, Zaknoun had an emergency situation and had to leave work early. He properly cleared his departure with Cpl. Tierney but then Tierney still accused him of not calling off on the radio as he was supposed to do. Audio recording later proved that Zaknoun had properly called off duty but he was still given a reprimand.

85. In another instance, Zaknoun had forgotten his knife when he and other officers were supposed to receive knife training from Tierney. Zaknoun explained that his wife had recently washed his vest and she may have forgotten to put all the items back in. Tierney berated and questioned Zaknoun as if he was lying about the situation in front of all the other officers at training, in an attempt to humiliate and embarrass him.

86. Zaknoun brought this and other behavior to Chief Lustig's attention. Zaknoun's Sergeant attended the meeting with Lustig and commented that Zaknoun had been drug "through the mud." Yet Tierney was still promoted and Zaknoun does not believe he ever was disciplined for his behavior. Instead, Chief Lustig asked Zaknoun if he wanted a hug, as if that would fix everything.

87. Tierney also had a habit of making fun of disabled persons, knowing that Zaknoun had a disabled (blind) daughter.

88. Tierney also would constantly remove Zaknoun's mailbox from its proper location and hide it in various places and would engage in other harassing behavior.

89. Tierney was also accused of harassment and abuse by former Officer John Cwynar. Lustig ordered Zaknoun to speak to attorneys for the Village who were conducting an investigation into Cwynar's allegations against Tierney, which included Tierney texting Cwynar pornographic images, making up racist names to put in the ICLEAR database, spying on employees to try to get them terminated, making fun of disabled people, and harassing other employees, including Zaknoun. Zaknoun told Lustig that he did not want to meet with them because he did not think that the Chief would like what he would tell them, i.e., that he also had complained about a lot of the same conduct about Tierney, thus corroborating some of Cwynar's allegations. Lustig

ordered Zaknoun to meet with the attorneys anyway and he did so and gave them truthful information about Sgt. Tierney. In reaction to what Zaknoun told them, one of the Village's attorneys spontaneously commented to him, words to the effect that, 'Oh, so Cwynar wasn't lying when he said Tierney was trying to get you fired.'

90. Upon information and belief, Lustig learned what Zaknoun had told the attorneys, which gave Lustig another reason to target Zaknoun for unfair treatment.

91. Zaknoun also complained of harassment by Corporal Janusz. Janusz often yelled and belittled Zaknoun in front of other officers. In one instance, Zaknoun merely asked which squad car he should take and Janusz yelled at him in a belittling manner.

92. In another instance, Janusz accused Zaknoun of insubordination for the manner in which he spoke to him regarding "early car," picks. Janusz was not on Zaknoun's shift and Zaknoun had already spoken to the other officers on his shift about the issue and was doing what others had always done. When he told Janusz that he had already cleared everything and this did not concern his shift anyway, Janusz wrote him up for insubordination.

93. Upon information and belief, white officers were not treated this way.

94. In another instance, Zaknoun was written up for "insubordination," because he shredded a survey which he did not realize was mandatory, after he returned from vacation. When the Sergeants who witnessed him shredding the survey told him he should not have done that because the Chief wanted everyone to return the survey, he immediately informed them that he was not aware of that and that he would get a new survey and fill out. Nevertheless, they wrote him up for insubordination, even though they knew he had made a mistake. Afterwards, one of his Sergeants told him that the

Department was worried that Zaknoun might sue and therefore they were trying to fill his file with negative information.

95. In another instance, Zaknoun had complained about another officer dodging calls while on duty, and he called into dispatch and told them about that officer's practice of dodging calls. Ultimately, the Chief suspended Zaknoun for one (1) day for making this complaint to Dispatch. Yet, another officer, who was white, discharged a live round in the men's locker room of the police department was only given a verbal reprimand. Upon information and belief, the Department concealed the occurrence from NIPAS so that officer would not be disqualified from joining NIPAS. After Zaknoun was suspended for complaining to Dispatch, Zaknoun noted on his evaluation that it was interesting that the "Middle Eastern guy" gets written up for complaining to Dispatch, but a white officer can discharge a live round in the locker room and does not get suspended. Only after making this comment, upon information and belief, was that officer given a written reprimand for discharging the round.

96. As a further example of Lustig's unfair treatment of Zaknoun over the years, upon information and belief, Zaknoun always received one of the lowest bonus checks of any of the officers in the Department. When he asked why, he would be told that he was not doing enough traffic stops even though he was in the patrol unit and not the traffic unit. This excuse would be used to give white officers higher bonus checks and advance their careers.

97. In 2022, Deputy Chief Hutensky wrote Zaknoun up for "sick time abuse," because he had called in after a scheduled day off due to back problems. Zaknoun explained that

because of his back issue, he would have had to take an ambulance to the ER to get a doctor's note and he knew that he just needed to lie flat for his back to improve. Nevertheless, Hutensky wrote him up anyway and then attempted to impose a further condition applicable only to Zaknoun that when he called off in the future, he would need a doctor's note expressly stating the nature of his illness. When Zaknoun pointed out to him that this violated HIPAA, the requirement was withdrawn.

98. In fact, Zaknoun's mistreatment at the Department was so widely known that one supervisory officer commented to other officers at a roll call that they should be careful not to end up being "the next Louis."

99. The pattern and practice of unfair treatment, harassment, abuse and retaliation has thus continued through the actions of Brennan and Hutensky detailed above with respect to their denial of light duty or even unpaid leave. They were determined to use Zaknoun's temporary disability and thus his temporary inability to return to full duty as an excuse to terminate him because of his past complaints of unfair treatment, and his age, rather than grant him light duty at the Police Department consistent with the Department's General Orders and the past practices of the Department and the Village.

## ZAKNOUN'S RELEASE FOR FULL DUTY AND RESIGNATION

100. On or about October 19, 2024, Zaknoun followed up with his health care provider as had been planned since July. At that time, Zaknoun's health care provider released him for return to full duty with no restrictions.

101. Zaknoun's counsel provided the medical release to the attorneys for the Village.

102. After Zaknoun was released for full duty, the BOPC agreed to continue the hearing on Zaknoun's termination, but the Village would not yet dismiss the Complaint for termination against Zaknoun.

103. After receiving the medical release from Zaknoun's health care provider, the Village demanded that Zaknoun undergo a "fitness for duty evaluation," by its own doctors, which included a separate functional capacity evaluation.

104. The Village sent medical releases to Zaknoun's counsel to obtain Zaknoun's medical records to be provided to the Village's doctor. However, the medical releases were overbroad requesting that Zaknoun provide authorizations for the Village to receive all his medical records, regardless of timeframe or their relation to the issues at hand, and granting the Village the right to speak to Zaknoun's health care providers about his medical conditions.

105. Zaknoun responded that the releases were overbroad and that he would directly provide copies of his relevant medical records.

106. After a few days delay in providing the records, Acting Chief Hutensky sent Zaknoun a letter again demanding the records and threatening him with reprimand for disobeying an order if he did not provide the records by a date certain.

107. Zaknoun dutifully provided the records to the Village's doctor when requested.

108. Rather than the Village's attorney simply emailing Zaknoun's counsel to inquire about the status of the records, Hutensky instead decided to threaten Zaknoun with more disciplinary action.

109. Zaknoun attended both the functional capacity evaluation required by the Village and the appointment with the Village's doctor.

110.    When speaking with the company performing the functional capacity evaluation for the Village, Zaknoun inquired what it would consist of, he was informed that the Village had requested that in addition to other tests, Zaknoun would be required to pass the POWER test at the specific request of the Village.

111.    The POWER test is a physical test given typically to new police recruits and lateral hires. The test is physically demanding and those taking it often train for weeks to ensure that they can pass it. Yet, the Village was going to force Zaknoun to pass the POWER test on short notice, without adequate time to prepare, and without providing him notice of what would be required as part of the functional capacity evaluation.

112.    Upon information and belief, other officers who had been granted light duty or who had taken leave for medical reasons, have not been required to pass the POWER test or undergo the same functional capacity evaluation that Zaknoun was. Again, he was singled out for unfair treatment by Brennan and Hutensky.

113.    Zaknoun declined to take the POWER test at the functional capacity evaluation but completed the other elements required of him. The provider performing the functional capacity evaluation reported that he passed the functional capacity evaluation and that he could perform his duties as a police officer.

114.    Zaknoun then attended the appointment with the Village's doctor, who also cleared him for return to full duty and reported that he was in good shape for his age.

115.    Thereafter, the Village demanded that Zaknoun return to work on short notice before the Complaint to Discharge him even was dismissed and without addressing any of his complaints relating to the unfair treatment he had received by Brennan and Hutensky.

26

116.    Zaknoun did not believe he could return to work for the Village because of the unfair treatment he had received by Brennan and Hutensky, and earlier. Zaknoun reasonably believed he would continue to face a hostile work environment, in which Brennan and Hutensky would be looking for any excuse to discipline him and would fail to support him in the event of any citizen complaint or incident in the future.

117.    On or about December 1, 2024, Zaknoun indicated his intent to resign from the Department once the Complaint against him was dismissed because of the history of mistreatment he had received. The Village immediately accepted this as his resignation.  In his response, Brennan pretended to be unaware of any of Zaknoun's complaints of mistreatment.

118.    Because of the unfair discipline and treatment over the years, and the material placed in Zaknoun's personnel file, his prospects of finding other employment as a sworn police officer are greatly diminished and his income in his future years will be greatly reduced.

119.    The actions of Lustig, Brennan and Hutensky detailed above have caused and continue to cause Zaknoun mental distress and anguish, and caused him physical distress as a result of the mental anguish he suffered, which increased the healing time from his back surgery.

120.    Because of the actions of Brennan and Hutensky in denying Zaknoun light duty, he has lost wages, been forced to pay out of pocket for insurance, has lost the opportunity to earn accrued time off, has accrued an arrearage in his pension contributions and has incurred expenses in the form of attorney's fees.

121.    Because of the action of the BOPC in publishing the agenda relating to the Complaint to Discharge him, Zaknoun's reputation has been damaged and he will now be compelled to disclose private medical information to explain the charges for dismissal that Brennan filed against him.

## <u>COUNT I: HARASSMENT, DISCRIMINATION, RETALIATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII</u>

122.    Zaknoun incorporates herein Paragraphs 1-121 of his Complaint as if fully set forth herein.

123.    Title VII makes it unlawful for an employer to discriminate against an employee with respect to compensation, terms, conditions and/or privileges of employment because of race, ethnicity, national origin and because the employee complained about harassment and/or discrimination, among other things.

124.    Title VII also makes it unlawful for an employer to limit, segregate, or classify an employee in any way that would deprive or tend to deprive the employee of employment opportunities, or otherwise adversely affect his status as an employee because of race, ethnicity, national origin or because of past complaints of harassment and discrimination.

125.    By its acts and omissions detailed above, Defendants subjected Zaknoun to a hostile and abusive work environment, and harassed, discriminated, and retaliated against him based on his national origin and his past complaints of unfair treatment.

126.    The above-described harassment, discrimination and retaliation was severe and pervasive and created both a subjective and objectively abusive, intimidating and hostile work environment that caused Zaknoun mental and emotional distress and anguish.

127.     As a direct and proximate result of Defendants' actions, Zaknoun has suffered damages in the form of lost wages, lost comp. time and accrued time, accrued a pension arrearage, and incurred attorney's fees and other costs.

128.     As a further direct and proximate result of Defendants' actions, Zaknoun was compelled to resign his position and now faces diminished employment prospects and will continue to suffer lost income in the future.

129.     As a further direct and proximate result of Defendants' actions, Zaknoun's reputation was tarnished and he will be compelled to disclose private medical information to try to repair his reputation.

WHEREFORE, Plaintiff prays that this Court enter judgment in his favor on Count I and award Plaintiff damages for his lost income and benefits; the emotional distress and anguish he suffered; his physical pain and suffering resulting from the emotional anguish caused by Defendants' illegal actions; equitable relief in the form of a monetary award in lieu of reinstatement due to the hostile work environment; reasonable attorneys' fees and costs of this action as allowed by law; prejudgment and post-judgment interest to the extent allowed by law; and for all other just and proper relief in the premises.

## COUNT II: VIOLATIONS OF THE ADA

130.     Plaintiff incorporates herein Paragraphs 1-122 of his Complaint as if fully set forth herein.

131.     The Americans with Disabilities Act makes it unlawful to discriminate against an employee on the basis of an employee's disability, because of a record of disability, or because the employer regards the employee as suffering from a disability and to fail or refuse to accommodate and employee's disability.

132.    Plaintiff was suffering from a disability within the meaning of the ADA when he was denied light duty and/or unpaid leave by Defendants when Plaintiff requested light duty in June, and, again, when Defendants failed to grant light duty and/or unpaid leave after his scanning project was terminated in August, 2024.

133.    Defendants' acts and omissions as alleged above constitute discrimination on account of disability in violation of the ADA as well as the Village's own policies and the Department's applicable General Orders.

134.    As a direct and proximate result of Defendants' actions, Zaknoun has suffered damages in the form of lost wages, lost comp. time and accrued time, accrued a pension arrearage, and incurred attorney's fees and other costs.

135.    As a further direct and proximate result of Defendants' actions, Zaknoun was compelled to resign his position and now faces diminished employment prospects and will continue to suffer lost income in the future.

136.    As a further direct and proximate result of Defendants' actions, Zaknoun suffered emotional distress and anguish.

WHEREFORE, Plaintiff prays that this Court enter judgment in his favor on Count II and award Plaintiff damages for his lost income and benefits; the emotional distress and anguish he suffered; his physical pain and suffering resulting from the emotional anguish caused by Defendants' illegal actions; equitable relief in the form of a monetary award in lieu of reinstatement due to the hostile work environment; reasonable attorneys' fees and costs of this action as allowed by law; prejudgment and post-judgment interest to the extent allowed by law; and for all other just and proper relief in the premises.

## COUNT III: VIOLATIONS OF ADEA

137. Plaintiff incorporates herein Paragraphs 1-122 of his Complaint as if fully set forth herein.

138. The Age Discrimination in Employment Act makes it unlawful for an employer to discriminate against an employee because of his age.

139. Brennan's comments to Zaknoun that 'at his age,' it takes longer to heal and maybe Zaknoun should just retire and move on to another profession, evidence that Plaintiff's age was an additional motivating factor in Brennan's decisions to deny Plaintiff's request for light duty and/or unpaid leave.

140. As a result of Defendants' illegal discrimination against Plaintiff because of his age, he has lost wages, benefits, incurred costs and attorneys' fees. Plaintiff will continue to lose income in the future because of his diminished employment prospects and has suffered and will continue to suffer emotional distress and anguish.

WHEREFORE, Plaintiff prays that this Court enter judgment in his favor on Count III and award Plaintiff damages for his lost income and benefits; the emotional distress and anguish he suffered; his physical pain and suffering resulting from the emotional anguish caused by Defendants' illegal actions; equitable relief in the form of a monetary award in lieu of reinstatement due to the hostile work environment; reasonable attorneys' fees and costs of this action as allowed by law; prejudgment and post-judgment interest to the extent allowed by law; and for all other just and proper relief in the premises.

### COUNT IV: VIOLATIONS OF THE ILLINOIS HUMAN RIGHTS ACT

141. Plaintiff incorporates herein Paragraphs 1-122 of his Complaint as if fully set forth herein.

142.    The Illinois Human Rights Act prohibits discrimination prohibits in employment

based on race, ethnicity, national origin, disability, age, and other factors.

143.    Defendants' actions as alleged above violated the Illinois Human Rights Act.

144.    As a direct and proximate result of Defendants' violations of the Illinois Human

Rights Act, Plaintiff has lost wages and benefits, will lose wages in the future, has

incurred attorneys' fees and costs, and has suffered emotional distress and anguish.

WHEREFORE, Plaintiff prays that this Court enter judgment in his favor on Count IV

and award Plaintiff damages for his lost income and benefits; the emotional distress and anguish

he suffered; his physical pain and suffering resulting from the emotional anguish caused by

Defendants' illegal actions; equitable relief in the form of a monetary award in lieu of

reinstatement due to the hostile work environment; reasonable attorneys' fees and costs of this

action as allowed by law; prejudgment and post-judgment interest to the extent allowed by law;

and for all other just and proper relief in the premises.

Respectfully submitted,

*/s/ Edward G. Zaknoen*
Edward G. Zaknoen, Attorney at Law
Attorney for Plaintiff
Attorney No. 6239683
161 N. Clark Street, Suite 1600
Chicago, Illinois 60601
312-465-8533
ezaknoen@gmail.com

## JURY DEMAND

Plaintiff, by counsel, hereby demands trial by jury on all claims triable to a jury.

Respectfully submitted,

*/s/ Edward G. Zaknoen*

Edward G. Zaknoen, Attorney at Law
Attorney for Plaintiff
Attorney No. 6239683
161 N. Clark Street, Suite 1600
Chicago, Illinois 60601
312-465-8533
ezaknoen@gmail.com